WILLIAM E. MAYHEW AND OTHERS, *vs.* WILLIAM GRAHAM, AND WILLIAM S. PAWSON.—*December* 1846.

In an action at law to recover the value of materials furnished to a vessel, it appeared that the plaintiff had sold and delivered them, upon the request of *B*, to whom they were charged on the books of the plaintiff; that a month before, *B* had executed a bill of sale of the vessel to the defendants, who immediately after took the oaths of ownership under the acts of Congress, and had a register executed in their own names, one of them being therein described as master. The vessel sailed on her voyage. The plaintiffs offered in evidence the application of the defendants for insurance on her hull and freight, and the policies issued thereon, dated about a month after the supplies were furnished. The plaintiffs stated, that the object of

Mayhew, *et al.*, *vs.* Graham and another.—1846.

offering the order for insurance, and the policies in evidence, was to show a continuing title in the defendants to the vessel, from the execution of the bill of sale to the date of the order. HELD, that the evidence was admissible.

Prior to the 6th October, *B* was the owner of a vessel. On the 15th November, as owner, he chartered her to *H* for a voyage, to be paid freight a sum certain by the month, and agreed to put her in good repair to prosecute the contemplated voyage. On the 10th December, the plaintiffs, at the request of *B*, sold and delivered him supplies for the vessel, on six months' credit. The master of the vessel was appointed by *H*. She performed her voyage, and returned to her port of departure in about eight months. It also appeared, that on the 6th October, *B* executed a bill of sale of the vessel to the defendants, who thereupon subscribed the usual oaths at the custom house, and took out a register in their own names. After the vessel sailed on her voyage, they effected insurance upon her hull and freight, payable to themselves in case of loss. During the months of *October* and *November*, she was in the possession of *B*, and after the charter, in the possession of *H*. The defendants had no possession, and exercised no control over the vessel, until after her return, when they sold her. Immediately after the vessel sailed, the defendants gave *H* notice to pay the freight to them. In an action by the material men, the defendants, *for the purpose of showing that they held the title to the said vessel, under the bill of sale, in trust, as a security to pay B's note, dated 7th October, payable at four months*, proposed to prove, that *B* was their debtor upon that note; that they, on the 21st January, took an assignment of the charter party from *B*, expressed "to secure such note," the vessel "mentioned therein having been transferred to them before the charter was made," and to prove such note and assignment; that *B* gave the defendants credit for the premium of insurance paid by them; that the freight received by defendants, was credited to *B* by defendants on account of said note, and the proceeds of her sale were likewise credited by them to *B*. HELD, by the *county court*, that the note, assignment of the charter party, entries of charges and credits on the books of either *B* or the defendants, were inadmissible for the purpose for which they were offered. Affirmed upon appeal by a division of this court.

Upon the whole evidence, the county court *refused* to instruct the jury:

1st. That there was no evidence from which the jury might infer, that *B* acted as the agent of the defendants, in purchasing said supplies, or that he had any authority or directions, express or implied, from defendants to purchase the same on their account.

2nd. That although the supplies were delivered for the use of the vessel, yet, if they were sold to *B*, on his own credit, and not upon the credit of the defendants, the plaintiffs cannot recover.

3rd. That if sold to *B*, upon his special personal request, the plaintiffs cannot recover, although applied to the use of the legal, general owners, under the bill of sale and register.

OF MARYLAND. 341

Mayhew, et al., vs. Graham and another.—1846.

4th. That if the jury believe, that *B* had the possession and control of the vessel after the date of the bill of sale, and exercised acts of ownership over her, and directed how she should be managed, that he continued to have such possession and control—made the charter party—that *H* appointed the master, and that the defendants never had any possession or control from the time of the execution of the charter, until the completion of the voyage, and in no way interfered with said vessel or charter, except to request *H* to pay them the freight; that then *B* was owner, so far as to be competent to execute the charter, and his stipulations in the charter did not raise any *assumpsit* on the part of the defendants, to pay for the supplies in question.

5th. That although the jury may find, the defendants were the legal, general owners of the vessel—took possession of, and sold her after the voyage was completed—assented to the making of the charter, or made no objection to it after it was made, still, if the supplies were furnished, upon request of *B*, in fulfilment of the charter, the plaintiffs cannot recover.

6th. That if the jury find that, at the time when the charter was executed, *B*, by the permission of the defendants, had the possession and control of the vessel—had had previous possession and acted as owner, then it was competent for him to make said charter as owner, and to recover the freight thereon for his own use, and was responsible for said supplies, and the defendants were not responsible as general owners, whether the plaintiffs knew that the defendants were such owners or not, provided the supplies were sold to *B*, upon his special request, were charged to him; and the jury believe, that *G*, one of the plaintiffs, advised the defendants to procure the assignment of the charter.

7th. That if the jury find, that the legal title to the vessel was in the defendants, *M*, *F*, and *M*; yet, if they believe, they held such title for the use of the firm, *W E M & Co.*, which included another partner, that the firm procured insurance, and requested *H* to pay the freight to said *firm*, by reason of the beneficial interest they had, and not as general owners, then the fact of obtaining such insurance, is not evidence of such ownership as to charge them, the defendants, as owners.

8th. That if the jury find, that *B* never did deliver the actual possession of said vessel to the defendants, or any of them, in pursuance of the bill of sale, and the defendants never took possession of her until her return—then the title of the defendants was never perfected, so as to render them responsible for any supplies furnished, upon the request of *B*, after the execution of the charter party, while he held possession and had control as owner of said vessel.

9th. That if the jury find from the evidence, that the supplies furnished or delivered for the use of the vessel, were sold to *B*, upon his credit, and not upon the credit of the defendants, then the plaintiffs are not entitled to recover, unless the jury find from the evidence, that *B* was the agent of the defendants in purchasing the same from the plaintiffs.

All which refusals were affirmed, upon appeal, by a division of this court.

Appeal from *Baltimore* county court.

This was an action of *assumpsit*, brought to May term 1842, of said county court, by the appellees against *W. E. Mayhew & Co.*, the firm consisting of *William E. Mayhew*, *William D. Miller*, *Alexander Fisher*, and *Gorham Brooks*. Errors of pleading and misjoinders of parties were mutually waived. The defendants pleaded *non assumpsit*, and the verdict was for the plaintiffs.

1st Exception. At the trial, the plaintiffs gave in evidence by *Henry Hinkley*, that between the 15th and 20th November 1841, *Hugh Boyle* called at the store of the plaintiffs and had some conversations with one of the plaintiffs, and requested him to go and examine the ground tackling of the brig *Harriet*, to see if they would do for a voyage to the coast of *Africa*. That afterwards *B.* called several times, and had conversations with said *W. Graham*, and though he, the witness, did not hear all that passed between said *B.* and *G.*, he knows that the claims charged in the account now produced and shown to witness, to wit:—

"Baltimore, 10*th December* 1841.
Mr. *Hugh Boyle* bought of *William Graham*,

| | | | | |
|---|---|---|---|---|
| 90 fath. 1 inch chain, wg. | 5570 lbs., | a 7½ cts., | $417 75 |
| 60 " ⅞ do. " " | 2760 " | a 7¾ " | 213 90 |

$631 65"

Were certainly sold by the plaintiffs to said *B.*, for the said brig *Harriet*, at the prices stated in the account. That said chains were ordered about the 20th November, and delivered to the drayman of said *B.*, on or about the 10th December, and that on the same day they were charged to the said *B.*, in the books of the plaintiffs. That a day or two afterwards, or perhaps the same day, the witness as clerk of the plaintiffs, made out said account of said chains against said *B.*, and carried and delivered the same to said *B.* That he, the witness, understood the said chains were sold on a credit of six months, and that *B.* was to give his note for them accordingly.

Upon cross-examination the witness stated, that a short time after the plaintiffs heard that *B.* had become insolvent, he, the

witness, heard *Graham* say, that he, *G.*, had advised *W. E. Mayhew*, to procure from *Boyle*, an assignment of the charter party for said brig *Harriet*, that had been made by *Boyle* to *James Hall*.

Upon further examination-in-chief, the said witness testified, that *B.* failed in a few days, perhaps a week or less, after the delivery of said chains. That since this suit was brought, he has heard said *Graham* say, that said *Mayhew* had stated to him, that he, *M.*, did not consider himself personally responsible for the said chains, but that he thought that the brig was liable. That after the sale and delivery of the said chains, he often heard said *G.* say, that he supposed that said *B.* was the owner of said brig, at the time when the sale of said chains was made to him.

The plaintiffs then read in evidence the bill of sale conveying the entire interest of the brig *Harriet* from *Boyle* to *William E. Mayhew, Alexander Fisher*, and *William D. Miller*, bearing date the 6th October 1841; it being admitted to have been executed by *Boyle*, and delivered to the grantees therein named.

The plaintiffs further gave in evidence by *Ring*, that he was a clerk in the custom house in the city of *Baltimore*, in the year 1841; and that on the 8th day of October of that year, *W. E. M., A. F.*, and *W. D. M.*, appeared in said custom house, and in pursuance of the laws of *The United States*, took out a register for said brig, and made the oath therein contained, in which register it was recited, they " In pursuance of an act of the Congress," &c., *W. E. M., A. F.*, and *W. D. M.*, of *Baltimore*, &c., "having sworn that they are the only owners of the ship or vessel called the *Harriet of Baltimore*, whereof *Alexander Fisher* is at present master, &c.; and also proved the oath of ownership subscribed by the said defendants, dated 8th October 1841, and on which said register was granted.

The witness, *Ring*, further testified, that *Fisher* was named and sworn as master of said brig, at the time when said registry was made.

Upon cross-examination the said witness testified, that said *Fisher* was a merchant, of the firm of *W. E. M. & Co.;* and that he never did, to the knowledge of this deponent, go on board of said brig. That it is necessary when a registry of a vessel is made, that some one should be named as master; and that if there be no acting master, it is the custom to name some one as master.

The plaintiff then offered to read in evidence to the jury, the original offer in writing, made in the name of *W. E. M. & Co.,* to the *Neptune Insurance Co.,* for insurance upon the said brig *Harriet* and her freight, dated 19th January 1842, payable to them in case of loss, which paper, it was admitted, was signed by *W. E. M.,* one of the defendants, in the name and on behalf of the firm of *W. E. M. & Co.,* which was composed of all the defendants named in the record of this case, and the policy of insurance effected in their name on such offer for insurance, accepted by said company.

To the reading of which offer and policies, the defendants objected, as inadmissible evidence; the purpose for which they were offered being stated to be, to show a continuing title to said brig in the grantees, named in said bill of sale of 6th October 1841; although it was admitted that there was an agreement in this cause, between the counsel, that no objection should be taken on account of the misjoinder, as defendant, of *Gorham Brooks*; and that the suit should be prosecuted as if instituted against the other three defendants only. The county court, (LE GRAND, A. J.,) overruled the objection, and declared the order and policy to be admissible.

2ND. EXCEPTION. The plaintiffs having given in evidence the matters stated in the defendants first bill of exceptions, further gave in evidence the admitted fact, that said brig was cleared at the said custom house for her voyage to *Africa,* on the 20th December 1841. And further offered in evidence to the jury, a bill of sale of said brig, from *W. E. M., A. F.,* and *W. D. M.,* of 2nd November 1842, to *Greenbury B. Wilson,* which was admitted to have been executed.

The defendants then, to support the issue on their part, read in evidence to the jury the charter party for said brig *Harriet,*

dated 15th November 1841, made from said *Hugh Boyle*, as owner, to *James Hall*, for a trading voyage from *Baltimore* to the coast of *Africa*, at the rate of $300 per month; its execution being admitted. The charter party stipulated, that the said owner agrees to put the said brig in good and approved repair, so as to fit her for the accomplishment of the said voyage. And further gave in evidence by the testimony of *James Hall*, that he is the person named in said charter party, as freighter, and that he and said *Boyle* executed the same on the day of its date, and that immediately after the execution of said charter party, he, the witness, as freighter, in pursuance of said charter party, took possession of said brig, and appointed *William Champion* master of said brig, who immediately went on board. That he, said *Hall*, had the entire and exclusive possession and control of said brig, during the voyage mentioned in the charter party; and that said *Champion* continued to act as her master for the whole of said voyage, which terminated in July or August 1842. That none of the defendants, to his knowledge, had any possession or control of said vessel, before she sailed from the port of *Baltimore* on said voyage. That immediately after she had sailed, he received a notice from *William E. Mayhew & Co.*, to pay the freight to them; and he knows of no other act of any of the defendants in regard to said vessel, until after her return from *Africa*.

Upon cross-examination, the counsel for the plaintiffs then propounded to the said witness, *Hall*, the following question, viz., "When you appointed said *Champion* master of the brig *Harriet*, did you authorise him, *Champion*, to act as agent of *Mr. Boyle*, in procuring the supplies under the charter party?" To which question, and the answer that might be given thereto by the witness, the defendants by their counsel objected, as irrelevant to the issue in this cause, and inadmissible and improper testimony; but the court, (LE GRAND, A. J.,) overruled the said objection, and adjudged the said question proper, and the answer thereto, admissible testimony. And thereupon the said witness, *Hall*, in answer thereto, stated to the jury, that when he, the witness, closed the charter party with *Mr. Boyle*, he made a verbal agreement with him, *Boyle*, that captain

44   v.4

*Champion* should act as his, *Boyle's*, agent, in procuring supplies in fitting the vessel for the voyage, agreeably to *Mr. Boyle's* stipulations in the charter party. That said *Champion* was not then present. That afterwards he introduced said *Champion* to said *Boyle*, and told him to obey the instructions of *Mr. Boyle*, in procuring the articles requisite for the vessel, under the charter party. Whereupon the defendants excepted to the opinion of the court, in declaring said testimony of said *Hall*, (so as aforesaid objected to,) admissible.

3RD· EXCEPTION. The plaintiffs and defendants having given in evidence, respectively, the matters stated and set forth in the defendants' first and second bills of exception, and which are to be considered as a part of this, their third bill of exception; the defendants, then, to support the issue on their part, gave in evidence to the jury, by said witness *Hall*, that he, *Hall*, never gave said *Champion* any order or authority to buy said chains; and that he, the witness, does not know who did, in fact, buy said chains.

The defendants, further to support the issue on their part, then gave in evidence to the jury by *Charles L. Oudesluys*, that he acted as the clerk of said *Hugh Boyle*, during the year 1841, and until after July 1842. That the bill or account of the plaintiffs, for said chains, now shewn to him, the witness, (being the same account and paper spoken of in the testimony of the witness, *Henry Hinkley*,) was presented to said *Boyle*, in December 1841, and was by said *Oudesluys*, as his clerk, entered in the books of said *Boyle*, to the credit of said *William Graham*, on the eleventh day of that month. That said *Boyle* was in good credit at that time. That he first let a note lie over about the 25th of said month of December 1841. That he, said *Oudesluys*, subscribed his name as a witness for said charter party, and saw it executed by the parties thereto. That he knows that said *Boyle* had the possession and control of said brig *Harriet*, during the months of *October* and *November* 1841, at the time of the execution of the said charter party, from the fact that he continued to exercise acts of ownership, as he had always done. That prior to the execution of said charter party, said brig was lying some time at *Ramsay's*

wharf, on *Fells Point;* that said *Boyle* employed one captain *Cunningham* to look after her there, and paid some small expenses on her, and was chargeable with wharfage for her, and gave directions from time to time how she should be managed, and acted as owner, as he had always done. That he had owned said vessel for some years, and was desirous of procuring a freight for her before said charter party was made. That none of the defendants, to the knowledge of the witness, had any possession of said vessel until after her return from *Africa*, in July or August 1842. The defendants, then, further to support the issue on their part, and for the purpose of shewing that the said *W. E. M., A. F.,* and *W. D. M.,* held the title to said brig under said bill of sale, in trust as security, to pay the note hereinafter mentioned and inserted, made by said *Boyle,* in favor of *W. E. M. & Co.,* and to shew that said *Boyle* made said charter party on his own account, and for his own benefit, with the assent of the said *W. E. M., A. F.,* and *W. D. M.,* and that they and their partner, *Gorham Brooks,* took an assignment from said *Boyle* of said charter party, and the freight thereby to become payable; also, as security for the payment of said note, offered to give in evidence by said witness, *Oudesluys,* that he, the said witness, at the request of said *Boyle,* and the said *William E. Mayhew,* one of the defendants wrote upon the sheet of paper containing said charter party, an assignment of said charter party from said *Boyle* to the said *W. E. M., G. B., A. F.,* and *W. D. M.,* in form following :

"I hereby assign and transfer the foregoing charter party, and all my interest therein, to *W. E. M., G. B., A. F.,* and *W. D. M.,* of the firm of *W. E. M. & Co.,* as security to them for the payment of my note, four months from 7th October 1841, for $2628.17, held by them, and discounted by them for my use, the brig *Harriet,* mentioned therein, having been by me transferred to them before the foregoing charter party was made. *Baltimore,* 21st Jan'y 1842. Hu. Boyle.

Witness, *Charles L. Oudesluys.*"

And that he, said *Oudesluys,* saw the said *Boyle* subscribe his name to said assignment, and that he, said *Oudesluys,*

signed his own name as witness thereto, and saw the said charter party, and the said assignment thereon, then delivered to said *Mayhew*. And the defendants further offered to prove by said witness, *Oudesluys*, that said *Boyle* made and delivered to the said *William E. Mayhew & Co.*, on the day of its date, the following promissory note :

"$2628.17.                    BALTIMORE, *October 7th*, 1841.

Four months after date, I promise to pay to the order of *Messrs. Wm. E. Mayhew & Co.*, twenty-six hundred and twenty-eight dollars, and seventeen cents, for value received.

HU. BOYLE."

And offered to prove by said witness, that the said note was the note mentioned in said assignment, and that it was never paid by said *Boyle*. And then the said defendants offered to read in evidence, the said assignment of said charter party, and of said note. And further offered to give in evidence by said witness, that the said note, and the premiums of insurance paid by the said *W. E. M. & Co.*, for said policies of insurance on the brig *Harriet*, and her freight, were credited in the books of said *B.*, (produced in court on the trial of this cause,) to the said *W. E. M. & Co.* And further offered to give in evidence by one *Grafflin*, that he was a clerk in the store of the said *W. E. M. & Co.*, in the years 1841, and 1842, and 1843, and that the freight of said brig, on the day it was received, viz., the 29th day of August 1842, and before this suit was instituted, was credited on the books of said *W. E. M. & Co.*, to said *B.*, in part payment of said note of said *B.*, then due and unpaid, and which was charged by said firm to him; and furthermore, that the proceeds of said vessel, after she was sold by said *M., F.* and *M.*, to *Greenbury B. Wilson*, in November 1842, were likewise credited to said *B.* by said *W. E. M. & Co.* But the plaintiff objected to the admissibility in evidence of said assignment of said charter party, and of said note of said *B.*, in favor of *W. E. M. & Co.*, for the purpose for which the same were offered, and of all and every of said entries, charges and credits, contained either in the books of said *B.*, or of the said *W. E. M. & Co.*, so offered, to be given in evidence on the part of the defendants

by the said witnesses, *Oudesluys* and *Grafflin*, respectively. And the court, (LE GRAND, A. J.,) sustained the objection to the whole of said evidence, and every part, and the same wholly excluded from the jury. The defendants excepted to the opinion of the court, in rejecting said evidence, and every part and parcel thereof.

4TH EXCEPTION. And the plaintiffs further to support the issue on their part, gave in evidence by *John Henderson*, that the firm of which he is a member, furnished supplies for the brig *Harriet* in November 1841, for her voyage to the coast of *Africa*, but that he did not know who was the reputed owner of said brig at that time. That he and his partner thought captain *Hall* was the owner when they furnished supplies for her.

Upon the whole evidence given to the jury, upon the trial of this cause, the defendants, by their counsel, prayed the opinion and the several instructions from the court to the jury, as follows:

1st. That there is no evidence in this cause from which the jury may infer, that *Hugh Boyle* acted as agent of the defendants, in purchasing the iron chain of the plaintiffs, the price of which they seek to recover in this action, or that he had any authority or directions, express or implied, from the defendants to make said purchase on their account.

2nd. That although the jury find from the evidence, that the iron chains, charged in the plaintiff's account to *Hugh Boyle*, were delivered for the use of the brig *Harriet;* yet, if they find that said chains were sold to *Hugh Boyle*, on his credit, and not upon the credit of the defendants, that then the plaintiffs are not entitled to recover in this action.

3rd. That if the jury find from the evidence, that the plaintiffs sold and furnished for the brig *Harriet* the iron chain aforesaid, upon the special personal request of *Hugh Boyle*, upon a credit of six months, and delivered the same to his drayman, and sent the account therefor to said *Boyle*, that then the plaintiffs are not entitled to recover, although the jury may find, that the said chains were, or some of them were, applied to the use of the legal, general owners, by virtue of

the bill of sale from *Hugh Boyle,* and the registry of said brig in the custom house, as given in evidence.

4th. That if the jury believe, that *Boyle* had the possession and control of the said brig *Harriet,* after the date of the said bill of sale, and exercised acts of ownership over her, by employing *Cunningham* to look after her, and by paying bills and expenses, and directing how she should be managed, and that he continued to have such possession and control, and to perform such acts of ownership, up to the time of the execution of the charter party given in evidence, and that he made the charter party to *Hall,* and that *Hall,* immediately thereafter, took possession of said vessel, under the charter party; and also appointed *William Champion* the master of said vessel; and that the defendants never had any possession or control of said vessel, from the time of the execution of the said charter party, until the completion of the voyage, in July or August 1842, and in no way interfered with said vessel or the said charter party, except to order or request *Hall,* the freighter, to pay the freight to *Wm. E. Mayhew & Co.,* that then *Boyle* was owner, so far as to be competent to execute the charter party, as owner for the voyage, and that his stipulations by the charter party, to furnish the supplies to fit the brig for the voyage, did not raise any obligation or *assumpsit* on the part of the defendants to pay for those supplies.

5th. That the defendants are not responsible to pay for the chains furnished in the month of December 1841, to the brig *Harriet,* upon the request of *Boyle,* after the execution of said charter party, in fulfilment of his, *Boyle's,* agreement in the charter party, although the jury may find, that the defendants were the legal, general owners of said brig, and took possession of her, and sold her after the said voyage was completed, in November 1842, provided they find, that the defendants assented to the making of said charter party, or made no objection to it after it was made.

6th. That if the jury find, that at the time when the charter party was executed, *Boyle,* by the permission of the defendants, had the possession and control of said vessel, and had for some time previously had such possession and control, and had

acted as owner, that then it was competent for *Boyle* to execute said charter party as owner, and to recover the freight thereon for his own use, and he was responsible to pay for the chains furnished by plaintiffs, upon *Boyle's* request, and the defendants were not responsible as general legal owners of said biig, to pay for said chains so furnished, whether the plaintiffs knew that the defendants were such owners or not, provided the jury find, that the said chains were sold by the plaintiffs to *Boyle*, upon his special request, and were charged to him; and if the jury believe, that *Graham*, one of the plaintiffs, advised the defendants to procure an assignment of said charter party to themselves.

7th. If the jury find from the evidence, that the legal title was in *W. E. M., A. F.*, and *W. D. M.;* yet, if they believe that they held such title for the use of the defendants, constituting the firm of *William E. Mayhew & Co.*, and that this firm procured insurance on said brig and freight, and ordered or requested *Hall* to pay the freight to said company, by reason of the beneficial interest they had, and not as general owners, that the fact of their obtaining such insurance, is not evidence of such ownership as to charge them, the defendants, as owners.

8th. That if the jury find, that *Boyle* never did deliver the actual possession of said brig to the defendants, or any of them, in pursuance of the bill of sale of October 1841, and the defendants never took possession of her until her return from *Africa*, in July or August 1842, that then the title of the defendants was never perfected, so as to render them responsible for any supplies furnished to said brig, upon the request of *Boyle*, after the execution of the charter party, by him made or executed, while he held possession, and had the control as owner of said brig.

9th. That if the jury find from the evidence, that the iron chain charged in the plaintiff's account, and furnished or delivered for the use of the brig *Harriet*, was sold to *Hugh Boyle*, upon his credit, and not upon the credit of the defendants, that then the plaintiffs are not entitled to recover in this action, unless the jury find from the evidence, that *Boyle* was agent of the defendants in purchasing the said chains from the plaintiffs.

But the court, (LE GRAND, A. J.,) refused to grant each and every one of said several prayers. The defendants excepted to the opinion and decision of the court, in refusing to grant each of said prayers, and appealed to this court.

The cause was argued before DORSEY, CHAMBERS, MAGRUDER and MARTIN J.

By HINCKLEY for the appellants, and
By TEACKLE and J. N. STEELE for the appellees.

MAGRUDER, J., delivered his opinion as follows:

It has already been decided by this court, in the case of *Henderson and Mayhew, and others*, 2 *Gill*, 393, that the owner of a vessel may be made answerable for supplies and articles procured by his agent, as in that case, although those articles had been charged to the agent, provided the vendor was ignorant at the time that such agent was not the owner.

This action was brought by the defendant in error, in order to recover the price of the various articles furnished for the brig *Harriet*, and the plaintiff could only recover, by proving to the satisfaction of the jury, that the defendants in the court below were, at the time, the owners of this vessel. In order to prove them to be the owners, a bill of sale, previously executed by *Hugh Boyle* to the defendants in the court below, was offered in evidence. Thereupon the defendants offered to prove by parol testimony, that this deed, though on its face a bill of sale, was understood, and intended by the parties to it, to be a mortgage. Was such testimony, for such a purpose, admissible?

In the case of *Wesley and Thomas*, decided, (see 6 *H. & J.*, 24,) in 1823, the court said, "by the rule of the common law, independent of the statute of frauds and perjuries, parol proof is inadmissible to contradict, add to, or vary the terms of the original agreement. This principle is founded in the wisest policy; it guards the chastity of written contracts against *all* interpolations, by considering the agreement as furnishing the best evidence of the intention of the parties." This case, it has always been supposed, decided questions like that now

before the court. It states the general rule, the reason of the rule, to guard the chastity of written contracts; and it afterwards sets forth the exceptions to the rule, within none of which was an attempt made to bring the case, now under consideration.

*Starkie*, in his work on evidence, is equally explicit: "Where written instruments are appointed, either by the immediate authority of law, or by the compact of parties, to be the permanent depositories and testimony of truth, it is a matter *both of principle and policy*, to exclude any inferior evidence from being used, either as a substitute for such instruments, or to contradict *or alter them*. Of principle, because such instruments are, in their own nature and origin, entitled to a much higher degree of credit, than that which appertains to parol evidence; of *policy*, because it would be attended with great mischief and inconvenience, if those instruments, upon which men's rights depended, were liable to be impeached and contradicted by loose collateral evidence." 3 *Starkie*, 995. *1st Am. Edit.* Oral evidence, he adds, shall in no case be received "to contradict, alter or vary a written instrument, either appointed by law, or by the compact of private parties, to be the appropriate and authentic memorial of the particular facts which it recites; for, by doing so, oral evidence would be admitted in usurpation of a species of evidence, decidedly superior in degree," p. 996. Hence the observation of *Lord Tenterden*, (in *Vincent and Cole*, 1 *M. & M.*, 258:) "I have always acted most strictly on the rule, that what is in writing, shall only be proved by the writing itself." "The writing, says *Domat*, preserves unchanged the matters entrusted to it, and expresses the intention of the parties by their own testimony. The truth of written acts is established by the acts themselves, that is by the inspection of the originals." *See* cases cited, *Broom's Legal Maxims, p.* 266.

Such, it would really seem, always has been deemed to be the law, and the reason of that law, in *England*, and from *England*, *Maryland* borrowed its law on this subject. This, it may be, is not in every respect the law in every one of our sister States, as will appear by the authorities collected in the

notes to *3rd Starkie,* 1009, and in *Norris' Peake,* 168. Other States, however, must be permitted to adopt such rules as they choose. It is the business of *our* courts to take care, that our law is not changed by different laws, and decisions, elsewhere.

It is thought, however, that advantage can be taken of this rule, only when the parties to the deed are the parties litigant, which is not the case here. But does this vary the law, as it was laid down in *Wesley and Thomas?* To say this, is to reverse that decision,—to say that the language used by the court on that occasion, did not express its meaning. To be sure, that was a case between the parties to the deed, out of which the controversy grew. But the court did not say that parol evidence could not be admitted in that suit, because, in that suit, the parties were parties to the deed, but because of a *general* rule; a rule that, in any case, parol evidence could not be received to contradict the deed;—to give it a meaning which its own words, without any interpolation, will not give to it, or to take from it, any portion of the meaning to be found in its words, unless the deed was impeached, and it was designed to prove, that there was something like fraud or mistake in or about it; and here was a deed to be construed, and no fraud, mistake, or surprise, was alleged.

The argument is, that the rule laid down in *Wesley and Thomas,* is a rule of which advantage can be taken only by one of the parties to it, in a controversy to which the parties to the deed are the parties. No such notion, I feel warranted in saying, can be found any where in the *Maryland Reports.* If we find it at all, it must be found elsewhere.

There is perhaps not a little danger, that in the prevailing fashion here, of referring to the decisions of courts elsewhere, although we may not, in strictness, make laws ourselves, for the good people of the State, yet we may make the courts and legislatures of other States, legislate for this State. This is an evil which "has increased, is increasing, and ought to be diminished." There is, however, it is believed, no great danger of being thus misled in this case, if we will take the trouble to examine and correctly understand the cases. It perhaps may

be safely affirmed, that there are repeated decisions of the courts of *New York*, which, so far from sanctioning this notion, would teach us, that the law is quite otherwise. In the cases, *Dey and Dunham,* 2 *John. Ch. R.,* 182, and *Dunham vs. Dey,* 15 *John. R.,* 555. *Strong and Stewart,* 4 *J. C. R.,* 167. *James vs. Johnson,* 6 *John. C. R.,* 417. *Henry vs. Davis,* 7 *J C. R.,* 40; and *Marks vs. Pell,* 1 *John. C. R.,* 594, it seems to be decided, that in the controversy between parties to the deed, parol evidence may be admitted to vary the terms of it; to prove that a bill of sale, absolute on the face of it, is in truth but a mortgage, and this in a suit between the party making the deed, and the person to whom it was made, the former alleging, that though a bill of sale, it was made to secure a debt, and asking leave to *redeem* property conveyed by a deed absolute on the face of it, and the defeasance resting in parol. In such a case, indeed, some such reasoning as this might seem to be admissible. The transaction is one between a creditor and his debtor, not between a vendor and vendee. The object of the parties was not the satisfaction of the debt, but merely to secure the eventual payment of it. To use that deed after it is obtained, not for the purpose for which the creditor professed to ask it, and for which, if the parol proof is received; it will show, that it was unquestionably designed, is an act of downright fraud in *a mortgagee;* in fraud of the agreement, and also *in fraudem legis,* which is peremptory, that no mortgagee shall, by any contrivance, deprive the mortgagor of his equity of redemption; "a fraud on the part of the defendant, a mortgagee, in attempting to convert a mortgage into an absolute sale." 4 *J. C. R.,* 167. In this last case, *Chancellor Kent* said, that the authorities cited by him, "are sufficient to show, that parol evidence is admissible in such cases, to prove that a mortgage was intended, and not an absolute sale, and that the party had *fraudulently* perverted the loan into a sale." Thus is made out a case of fraud, against which chancery will relieve. Same in *Va.* See 1st *Wash. R.,* 14. 1st *Hen. and Munf.,* 101.

In *England* it would seem, that such reasoning would not be entirely satisfactory to the court. See the cases in *Coote,* *pp.* 23, 24, &c., to show what is meant there by writers and

chancellors, when they say that "equity will admit even *parol* evidence," to show that an absolute conveyance was intended by way of security only. Indeed *Chancellor Talbot, ( Talbot's Cases in Eq., p.* 69,) condemned the practice which then prevailed in some parts of England, of taking an absolute deed, with a defeasance *separate from it,* saying, "to me, it will always appear with a face of fraud, for the defeasance may be lost, and then an absolute conveyance set up."

Here it may be proper to remark, that the unfortunate case of *Wesley and Thomas,* is, in another respect, most strangely misapprehended. The court is supposed to have decided, that as the case was one between parties to the deed, and simply for that reason, either party was estopped, and could not, by parol testimony, prove, that although it was *intended to be a bill of sale in form,* the design was merely to secure the payment of a debt. That question, it is believed, the court did not choose, perhaps was not prepared, to decide. The decision was, that in that, and such like cases, "it is essential," that the bill should charge fraud, mistake or surprise, to let in any parol proof. "It is essential on every principle of correct pleading, that that which gives jurisdiction to the court, should be distinctly and substantially alleged." The bill in that case made no such charge, and for that reason, the court was not authorised to look at the parol proof, and, of course, could not have relieved, although there had been the most satisfactory evidence, that the mortgagor agreed to execute a mortgage; that the mortgagee wrote it, undertook to read it to the other, and in doing so, contrived so to *misread* it, as to make it a mortgage in express terms. That there was a defect in the bill, which was then, and in that court, incurable by the proof, though that proof had been all sufficient to establish a fraud. It would not appear, from the *New York* and *English Reports,* that the courts there deem such a charge in the bill to be so essential, as it was declared to be in the above named case, though in this we may be misled by their reporters.

We are now urged to make the court say, what certainly it did not say: to declare that to the general rule upon which reliance is placed, there are *four* exceptions; when the court said

there were but *three;* to add to the words which were used, some such words as these, "And unless the parties to the deed were not parties to the suit," this would not be to " guard the chastity of the written" opinion, and for such violation of *its* chastity, we cannot find an apology in any evidence, parol, hearsay, or other, before us. And what would be the consequences of such an unauthorised interpolation? The rule would be entirely changed, and in place of the rule of common law, spoken of in *Wesley's* case, what is there stated to be the general rule, is made to be an exception to it. Correctly written, it would be made to read thus :—Parol evidence is admissible to contradict or vary the terms of any written instrument, in all cases; except only when the parties to the deed are parties to the suit; and in those cases too, provided there be fraud, accident, or mistake !

It is not questioned here that the deed was admissible to prove the fact for which it was produced, to wit, that the absolute title to the vessel was in the defendants. It was offered simply to prove, and, if there be no interpolation made, it was proof conclusive, that on the day of its date the defendants became the absolute owners of the vessel, and that fact being established, the liability of the defendants was made out; unless indeed they could have proved, that afterwards, and before the purchase of the articles, the price of which is claimed in this suit, the defendants had disposed of the vessel. No attempt was made by the defendants below, to prove any such sale; but they insist, (and it is their only answer to the claim,) that this deed, although absolute in its terms, did not give them an absolute title; and they wished to be allowed to prove by parol evidence, an agreement or understanding between the parties to it; and which certainly is to be found no where in the bill of sale. This would be to violate the principle which is laid down in *Wesley and Thomas,* and which, we are told, is founded " on the wisest policy; it guards the chastity of written contracts against all interpolations."

Indeed, to state the doctrine, is a refutation of it. It cannot be that the same individual, founding his title in each case upon the same written instrument, can insist, when a claim

against him is established by the deed, that the deed is not what it purports to be, and by parol evidence of this, defeat the claim; and yet, in a controversy between him and the person who executed the deed, at the same time, and although the testimony adduced in the other case, is now ready to be produced against him, may insist that the same deed, which he was , allowed in the former suit to prove, was only a mortgage, is in this suit no mortgage at all, and thus defraud his creditors or his debtors. Yet such would be the inevitable consequence, confining the rule laid down in *Wesley's* case to controversies, between the parties to the deed.

This however, it is contended, is the law, and that it is to be found in the law of estoppel. It has not been discovered, that the law of estoppel has any thing to do with the case under consideration. This is an attempt by the party grantee, to impeach a deed executed to himself, and which he has accepted. He offers oral testimony, which he says will give the lie to his deed, and will prove the real truth in regard to his title, which his own, and only evidence of title, conceals, and misrepresents. Upon what ground is the introduction of this parol testimony, *for such a purpose,* resisted? Did the plaintiff rely on the law of estoppel? no such thing. It was insisted, that " only, the best evidence attainable, was admissible. "It is a fundamental rule of our common law, that oral evidence shall not be given, to add to, subtract from, or in any manner alter or vary, *any description* of written contracts. *Quoties in verbis, nulla est ambiguitas, nulla expositio contra verba fienda est.* This general rule or principle has been established, on the ground, that the writing stands higher, in the scale of evidence, than the oral testimony; and that the stronger evidence ought not, therefore, to be controled or altered by the weaker." *Addison on Contracts,* 158. Such is the rule, except when testimony is offered to invalidate the instrument in a contract which cannot be impeached, as in this case, is made and reduced to writing by the parties; the writing must speak for itself, and not be interpreted by witnesses, who may at the time have misunderstood the parties to the contract, or if they correctly understood their meaning at the time, may since have forgotten

it. *Verba volant, scripta manent.* This is the law, and would have been the law of this case, although no law in regard to estoppel, had ever been heard of.

The case of *Carroll vs. Norwood*, 5 *H. & J.*, 164, was a controversy between two persons, one of them claiming indeed under the parties to a contract or grant, but the other, an entire stranger to it, and yet parol testimony to prove the intent of the parties, and the meaning of the written deed, was inadmissible.

It may sometimes be the case, that a deed is evidence for one party, and not admissible when offered in testimony by his adversary. "They alone," (the parties to the instrument,) "are to blame, if the writing contains what was not intended, or *omits that which it should have contained.* It cannot affect third persons." 1*st Greenl. on Evid.*, *sect.* 279. *See* also 4th chap., of same author.

In the trial of this cause, a deed executed by another person, to the defendants, was offered in evidence. The first enquiry was, for what purpose was that deed offered? If admissible, and admitted for that purpose, it is to speak for itself; and if its meaning be doubtful, who is to say what is its import? What interest in the thing thereby transferred, passed to the vendee? The court, and in construing it, "the court are to regard, and be governed by the intention of the parties, to be collected from the deed, if not incompatible with some rule or principle of law."—"And nothing extrinsic or *de hors* the deed, is to be recurred to, in ascertaining such intention." *Carroll & Norwood*, 5 *H. & J.*, 164. Except in the single case of a latent ambiguity, or unless the deed be impeached in a proper way, and by the proper person, for fraud, mistake, or surprise. Now, it cannot be pretended, that these defendants attempted to impeach this deed upon either of these grounds, or that there is in it any ambiguity, latent, or otherwise. "In such cases," we are told, in 1*st Greenleaf on Evidence*, *sect.* 277, "the duty of the court is to ascertain, not what the parties may have *secretly* intended, as contradistinguished from what their words express, but what is the meaning of the words they have used."

I adopt then, in reference to the question here, the language of *Ch. J. Tindel*, in *Attorney General vs. Shore*, 11 *Simons' Reports*:—"In such cases, evidence, *de hors* the instrument, for the purpose of explaining it according to the surmised, or alleged intention of the parties to the instrument, is utterly inadmissible. If it were otherwise, no lawyer would be safe upon the construction of a written instrument, nor any party in taking under it; for the ablest advice might be controled, and the clearest title undermined, if at some future period, parol evidence of the particular meaning which the party affixed to his words, or of his secret intention in making the instrument, or the objects he meant to take benefit under, it might be set up to contradict, or vary the plain language of the instrument itself."

It is due to the question, which of itself is of importance to the community, and which derives additional importance from the circumstance, that an equal division of the court seems to leave this a doubtful question, after it had been decided in the case of *Henderson and Mayhew*, that some notice should be taken of it, in connection with the case of *Crawford's Adm's, vs. Brooke, ante,* 113.

This latter suit was brought upon an account alleged to be due from the deceased to *Hodges & Brooke*, and by them assigned to *John B. Brooke*, the plaintiff in the court below. The assignee brought the suit as assignee, and grounded his right to be the legal plaintiff in the suit, upon the act of 1829, chap. 51. In order to recover, it was necessary that the jury should be satisfied, that the deceased owed to the assignors the sum claimed, and that the claim was not barred by the statute of limitation; also, as the assignment of it. To prove the claim and a promise by the deceased, within three years before the institution of the suit, to pay it, he examined as a witness, *Brooke*, (one of the assignors and original creditors,) and by him proved the services, and the promise to pay, within the three years; and also proved the assignment. Supposing this to be all the proof required on his part, in order to show that he was, *bona fide*, entitled to his debt; and supposing that a *bona fide* assignment could mean in tha case, nothing more

than an actual transfer, in the form used, of the debt, and not a contrivance by the aid of his own testimony, to recover money, which, when recovered, would go into his own pocket, the plaintiff, upon this proof, rested his case. Thereupon, the defendant below enquired of the witness, *quo animo*, he executed the assignment; and expected to prove by the answer, that it was executed and the debt transferred, for the purpose of enabling the witness to testify in the case, as before stated; and this proof the defendant said was offered, in order to show that the assignment was not according to the act of 1829. It appearing that the witness had no interest, whatever, in the event of the suit; and as the motives of the assignor could not affect the title of the assignee, to the money, (7 *Wheat.*, 566,) the court refused to direct the question to be answered, the answer having no tendency to prove what it was offered to prove, that the plaintiff was not *bona fide* entitled to the money for which the suit was brought. The case, then, was like a case of frequent occurrence in our courts, when a witness who has been examined, and has established the claim, is discovered to be interested as legatee, distributee, &c., and who for the declared purpose of being a witness, and proving the claim, releases, assigns, or transfers all his interest, and thereby makes himself a competent witness. The decision of the court then was, that as the witness had divested himself of all possible interest in the event of the suit, the question was inadmissible for the purpose for which it was put, but not that it was inadmissible for other purposes, such as to affect his credibility.

The exception then distinctly presents the question, whether this proof, if admitted, might not have shown, that by this assignment, which is required by the act of Assembly to be in writing, the plaintiff was, *bona fide*, entitled to the chose in action. This court reversed the judgment, but expressly upon the ground, that the answer, "which it must be assumed would have been given to the question, was material to destroy his competency, indeed, to avoid his assignment. The objection, it is added, was made by one who was injuriously affected by the assignment, upon the ground, that it was founded in fraud." In another part of the court's opinion, it is said, "if

46    v.4

was offered to prove, that the witness was influenced by considerations which would invalidate the instrument. Now if this court correctly understood that case, there can be no doubt that any person injuriously affected by the assignment, whether he be a party or a stranger to it, could offer proof to invalidate it. It is equally certain, that no two cases could be more unlike, than that case, and the one under consideration.

The counsel however, it seems, in support of the judgment of the court below, relied upon the principle, that parol testimony was inadmissible to contradict the written instrument. This, the court correctly observed, had no application to this case; in which the attempt was made, not to explain or contradict, but to invalidate the assignment. What is added, that the rule relied on by the counsel, is confined to the parties to the instrument, and does not extend to third persons, is inapplicable to the case before us; because in this case, the benefit of the rule is claimed by a third person, and it is a party to the deed, who denies that he ought to be affected by it.

It cannot be alleged, that in a case which is now to be noticed, the question under consideration was not expressly decided.

The case alluded to, will be found reported in 2 *Gill*, 393, and was against the same defendants, claiming of them a sum of money for articles furnished for the selfsame vessel as in this case, and on the selfsame ground, to wit, that these defendants were the owners of this vessel, *Harriet*. The proof of that ownership was the selfsame bill of sale, which is introduced into this case for the selfsame purpose; and the selfsame effort which is made in this, was made in that case, to defeat the claim by the introduction of parol evidence, to prove the bill of sale to be a mortgage. This parol proof was rejected in the court below, (by *Archer*, *C. J.*, and *Purviance*, *A. J.*,) and this court upon an appeal decided that case, precisely as the court below decided this case,—that parol testimony for such a purpose was inadmissible,—though that case, like the present, was brought against one of the parties to the deed, by a person who was not a party to it, nor the representative of any party to it, or claiming under it. In expressing the opinion of the court in that

case, the following language was used:—"The appellants, after obtaining an absolute deed, and authorising the community to regard them as the owners of the vessel, cannot now, for their own benefit be permitted to allege, that their bill of sale is a mortgage. The party here, who is a stranger to the deed, insists, that it is what it purports to be; and the appellants, who accepted it, are precluded from offering the evidence on which they rely, in order to defeat the action against them."

Surely we cannot in this case, quarrel with the decision of the court below, and pronounce that there was manifest error in it, when that court learned this law from a decision of this court, in a case which differs in no respect from this, but in the name of the plaintiff, and the sum claimed.

Entertaining the opinion, that the plaintiffs in error claiming under this bill of sale, must upon this appeal be considered the absolute owners, and that they cannot in the manner proposed, shift from themselves any responsibility which the law says shall be the consequence of such ownership, I think this judgment ought to be affirmed; and now—

MAGRUDER, J., delivered the opinion of this court.

It has already been decided by this court, in the case of *Henderson and others*, and *Mayhew and others*, December term 1844, (and see also *Wyman against Gray*, 7 *H. & J.*, 409,) that in the case of goods sold to an agent, if the principal be not known at the time of the sale, when he is discovered, he or the agent may be sued at the election of the vendor. In such a case, of course, the proof must establish, to the satisfaction of the jury, that the defendants were the owners of the vessel, and the plaintiffs were ignorant of it at the time of the sale. The several opinions of the court below, to this effect, are affirmed.

The plaintiff in the court below having offered in evidence a bill of sale, executed by *H. Boyle* to the defendants, conveying to them the vessel, for the repair of which, articles were furnished by the plaintiffs, efforts were made by the defendants below, to prove that the bill of sale was only intended as a mortgage. In these they were unsuccessful, and exceptions

were taken to the opinion of the court. This court being equally divided in opinion upon these exceptions, the opinions of the court below are affirmed.

JUDGMENT AFFIRMED.